1               IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF TEXAS

3                         MARSHALL DIVISION

4    TIVO INC.                    )(

5                                 )(      CIVIL DOCKET NO.

6                                 )(      2:15-CV-1503-JRG

7    VS.                          )(      MARSHALL, TEXAS

8                                 )(

9    SAMSUNG ELECTRONICS CO.,     )(      OCTOBER 24, 2016

10   LTD., ET AL.                 )(      1:30 P.M.

11                    CLAIM CONSTRUCTION HEARING

12          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:  (See Attorney Attendance Sheet docketed in
                          minutes of this hearing.)
17

18   FOR THE DEFENDANTS: (See Attorney Attendance Sheet docketed in
                          minutes of this hearing.)
19

20   COURT REPORTER:     Shelly Holmes, CSR-TCRR
                         Official Reporter
21                       United States District Court
                         Eastern District of Texas
22                       Marshall Division
                         100 E. Houston Street
23                       Marshall, Texas  75670
                         (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)

1                       I N D E X

2

3    October 24, 2016

4                                                  Page

5          Appearances                           1

6          Hearing                               3

7          Court Reporter's Certificate         75

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated, please.

3          All right.  This is the time for argument regarding

4    claim construction in the TiVo versus Samsung, et al., case.

5    This is Civil Case No. 2:15-CV-1503.

6          The Court will take announcements on the record at

7    this time.

8          What says the Plaintiff, TiVo?

9          MR. CHU:  Good afternoon, Your Honor.  Morgan Chu on

10   behalf of Plaintiff, TiVo, and at counsel table -- at the head

11   of counsel table is Sam Baxter from McKool Smith, and then

12   moving clockwise from Your Honor's left, Ben Yorks, Josh

13   Gordon, Ben Haber, Andrei Iancu.

14         MR. IANCU:  Good afternoon.

15         MR. CHU:  And we also have two representatives from

16   TiVo, Mike Schwartz and Matt Paik.

17         THE COURT:  All right.  Thank you, Mr. Chu.

18         What says Defendants?

19         MS. SMITH:  Good afternoon, Your Honor.  Melissa Smith

20   on behalf of Samsung.  I am joined by Mr. Ruffin Cordell,

21   Mr. Thad Kodish, Mr. Noah Graubart, Mr. Chris Green, and

22   Mr. Karan Jhurani.  Your Honor, we also have a few Samsung

23   representatives in the audience today.  Mr. Dan Girdwood,

24   Ilsung Tak, and Ms. Sanglim Lee.  And, Your Honor, we're ready

25   to proceed.

1          THE COURT:  Thank you, Ms. Smith.

2          Counsel, the Court's aware that leading up to today,

3    there were briefed and submitted in this case something on the

4    order of 20 disputed terms for construction.  My understanding,

5    based on meetings with counsel earlier today and emails that

6    have been exchanged, is that the parties are agreeing, with the

7    Court's approval, to present argument on five of the disputed

8    terms, with the remainder to be decided on the papers, those

9    five terms being input section, media switch, and media manager

10   from the TiVo asserted patents, and then channel

11   changer/channel selector and capable of displaying a user

12   interface from the Samsung patents.

13          Is that accurate?

14          MR. CHU:  Yes, Your Honor.

15          MR. CORDELL:  Yes, Your Honor.

16          THE COURT:  Okay.  Then unless there's some other

17   order that you believe is more compelling, we'll just take

18   argument on these five disputed terms in that order, beginning

19   with input section from the TiVo patents.  And I'll hear from

20   TiVo first on this patent or this term.

21          MR. CHU:  And may we approach to share slides with

22   Your Honor --

23          THE COURT:  Yes, you have leave to distribute your

24   materials, both sides.

25          And, counsel, before you begin this particular term,

```
 1   obviously, it was found in both the '389 patent, the '472, and
 2   the '476.  Would you agree that the issues are substantially
 3   the same in all three, or are they distinguishable?
 4           MR. IANCU:  We do agree, Your Honor.
 5           THE COURT:  All right.  Then let me have your argument
 6   on this term when you're ready.
 7           MR. IANCU:  I am ready.  Thank you, Your Honor.
 8   Andrei Iancu on behalf of TiVo.
 9           So as Your Honor has mentioned, the three patents,
10   '389, '472, and '476, are related, and we do believe that the
11   term, which is identical input section -- those words are
12   identical in the three patents -- should be treated the same
13   way.
14           And let's jump to Slide 38.  We did distribute
15   notebooks, Your Honor, but in the interest of time, we're not
16   going to go through every slide.  So we're going to jump around
17   a little bit.  I will announce on the records which slide we
18   are going to go to.  So --
19           THE COURT:  That's fine.
20           MR. IANCU:  -- beginning with --
21           THE COURT:  That's fine.
22           MR. IANCU:  Thank you.
23           Beginning with the input section, on Slide 39, we see
24   the two proposed constructions.  TiVo's construction -- we
25   propose to be the same as this Court has construed in prior --
```

1    in the prior EchoStar case.

2            Samsung believes that this term is a

3    means-plus-function term.

4            On Slide 40, we see the Court's prior construction,

5    and the Court said, quote, the plain and ordinary meaning of an

6    input section is the portion of a device that receives inputs.

7            Your Honor, there is nothing new in this case, nothing

8    new in the intrinsic or extrinsic record to suggest that the

9    term should be changed.  And the -- as a result, the same

10   constructions should apply.

11           Now, because of that, I want to shorten my

12   presentation and reserve most of my time for rebuttal, based on

13   what counsel says.  Perhaps there won't be much to say, but

14   just briefly, if we could jump to Slide 42.  Samsung says that

15   this is means-plus-function.  It isn't.  The word "means" does

16   not appear.  There is a presumption as a result that Section

17   112 Paragraph 6 does not apply.

18           Sure enough, there are situations where the

19   presumption can be overcome.  The Federal Circuit has said that

20   if we have generic terms, such as mechanism or element, things

21   like that, nonce words --

22           THE COURT:  I'm familiar with the Williamson case.

23           MR. IANCU:  The Court has said -- right.  That's not

24   the case here.  This Court, just earlier this year, and plenty

25   of other Courts have recognized a whole host of terms that do

1    not overcome the presumption.

2          Access point is an example from this Court earlier

3    this year.  Here, input section tells us, as the Court

4    recognized in the EchoStar case, what the device is.  It tells

5    us, in fact, where it is.  It's at the input, the front end.

6    It tells us what it means to receive inputs.  It's very much

7    unlike a module or an element where we don't know anything

8    about it other than the meaningless words, module, for example.

9    Here we know exactly what it is.

10          And as -- as I mentioned and as the Court has

11   recognized, the same term appears everywhere in the three

12   patents.

13          If we could go please to Slide 59.

14          The Federal Circuit has recognized in the past that

15   the same term should be interpreted the same way when it

16   appears in related claims.  And as a result, we think the same

17   construction should apply in all of them, meaning the portion

18   of a device that receives inputs.

19          Unless the Court has questions, I will reserve my time

20   for rebuttal.

21          THE COURT:  Let me hear argument from Samsung on this

22   term.

23          MR. GRAUBART:  May I approach, Your Honor?

24          THE COURT:  You may.

25          MR. GRAUBART:  Thank you.

1          Good afternoon, Your Honor.  Noah Graubart from Fish &

2    Richardson on behalf of the Samsung Defendants.

3          With respect to -- Mr. Jhurani, can you take us to the

4    first input section slide?  Thank you.

5          As you noted, this term applied -- it appears in all

6    of the '472, '476 patent claims, as well as the so-called

7    hardware claims of the '389 patent.  And as Mr. -- Mr. Iancu

8    said, under TiVo's primary construction, that is not 112(6),

9    they contend that the -- the construction should be the same.

10         The answer with respect to Samsung is slightly

11   different because as -- as the Court knows, we've proposed that

12   this be construed under Section 112(6), and although the

13   arguments as to whether the term is, in fact, governed by

14   112(6) are the same, regardless of which patent we're looking

15   at, once we've established that, then the question of what is

16   the corresponding structure, that differs.  And the reason is

17   that both parties agree that if 112(6) applies, there are

18   different functions recited in the claims.

19         So once we've got different functions, we look to the

20   specification for the corresponding structures, and those, of

21   course, differ.

22         The term -- the disputes here are simply whether it's

23   a means-plus-function limitation, and if so, what's the correct

24   corresponding structure?

25         As Your Honor knows, in the Williamson case, we found

1   that the strong presumption doesn't apply, and the Federal

2   Circuit listed those examples of nonce words.  One of them is

3   module.

4           Now, yes, this claim term is section, not module,

5   although TiVo's proposed construction is just portion.  I'm not

6   sure whether -- how much that's different from module.  But the

7   important point is that the specification here defines the

8   section as a module.  It equates the claimed term section with

9   the nonce word that the Federal Circuit identified as module.

10          The specification points us to input section 101, and

11  when we look at Figures 1 and Figure 2, those are simply black

12  boxes labeled modules.  So they're one and the same, and this

13  is merely a nonce word.

14          TiVo's own inventor -- and I -- we noted that this was

15  restricted AEO, but I understand TiVo's counsel has confirmed

16  they're okay with this being displayed on the screen.  TiVo's

17  lead inventor, Mr. Barton, confirmed that this was not a known

18  term in the art.  He -- the inventor simply slapped the terms

19  "input section" and "output section" on -- as arbitrary labels

20  on boxes that were collections of functionality.  It was merely

21  a nonce term defined in term of its function.

22          TiVo, in support of its construction, relies on this

23  IEEE dictionary definition of the word "input."  But itself

24  provides nothing more structurally.  It says it's a device --

25  again, we know that's a nonce word -- and that it's used for

1   bringing data into another device, purely functional.

2          So TiVo then turns to relying on the Apple versus

3   Motorola case from the Federal Circuit where the Federal

4   Circuit did say -- it did find in that case that 112(6) did not

5   apply.  And one of its reasons was it said that in -- the claim

6   at issue did reference the terms "inputs" and "outputs," and

7   that helped defined its structure.

8          But that was only one aspect of the Court's

9   conclusion.  Yes, in some situations where you have a known

10  term that has its own structure, defining its inputs and

11  outputs can also connote additional structure.  But the Court

12  has never found that -- the court --  the Federal Circuit has

13  never found that simply referencing some inputs and outputs

14  provides structure where the term itself has none.

15         And so when you look at the term that was actually at

16  issue in Apple/Motorola heuristic, the Federal Circuit said

17  that has a known meaning in the art that connotes structure to

18  a person of ordinary skill.

19         And in addition, we find that these inputs and outputs

20  confirm that.

21         And similarly, when we look at the Intellectual

22  Ventures II case that -- that counsel mentioned regarding

23  access point, Your Honor found that it had a definite -- it had

24  a known meaning that connoted definite structure to those of

25  skill in the art.

1          But when we're talking about section, which TiVo has

2     itself in its own patent defined as equated with module, which

3     the Federal Circuit tells us is a nonce word, there's no

4     structure.

5          Recently, in its reply brief, TiVo for the first time

6     raised additional extrinsic evidence that was not in its joint

7     claim construction statement and is, therefore, waived.  But

8     even if we look at it, TiVo contends that these extrinsic

9     references from the early 1990s or late 1980s describe how --

10    how a person of ordinary skill in the art would understand

11    input section to have structure.

12         But you'll see that these references' discussion of

13    input section, they vary widely in terms of the structure that

14    it supposedly conveys to a person of ordinary skill.  One is

15    another VCR, a camera, a microphone, an input filter, a

16    television receiver tuner.

17         And more importantly, none of those are linked to the

18    function that this claim needs to perform.  Here it says that

19    it's an input section for converting an input signal into an

20    M -- MPEG stream for further processing.  Well, if Your Honor

21    looks at this left-hand reference, the troubleshooting -- VCR

22    troubleshooting guide, it describes an input section as a

23    camera, a microphone, et cetera.  And then right below it, it

24    references a recorder section.  And that's what converts all

25    the input signals into a form for suitable saving, et cetera.

1          So the references on which TiVo rely here actually

2   confirm that a person of ordinary skill would not know input

3   section as a sufficiently definite structure for performing the

4   claimed function.

5          Mr. -- Professor Storer, TiVo's expert, I think his

6   opinion underscores also that TiVo's proposed construction of

7   just portion of a device that receives an input can't be right.

8   He says that, well, a person of ordinary skill would understand

9   that input section in the television field has a particular

10  meaning, such as the front end of a VCR or such as a television

11  receiver.  Well, that -- that may or may not be true, but

12  that's certainly not what TiVo's construction is.

13         So they're telling Your Honor that a person of

14  ordinary skill finds definite structure in the television field

15  for receiving television broadcast with a television receiver,

16  and yet they're -- they -- they tell you that it should be

17  construed as just a portion of a device for receiving, purely

18  functional terms.

19         So now we've established that 112(6) applies.  As the

20  Court knows, the next question is what is the corresponding

21  structure?  The parties agree what the claimed function would

22  be, and as I said in the '389 patent, it's this conversion

23  step.

24         What is the corresponding structure?  I think Your

25  Honor will find that the specification is pretty express here

1    on clearly linking that to either an MPEG encoder or an MPEG2

2    transport demultiplexor.

3            And why do I say either/or?  It's because the

4    specification tells us that.  It says that when you are

5    receiving -- when the system receives an analog input signal,

6    you're going to need an MPEG encoder.

7            TiVo -- nowhere in its briefing does it take issue

8    with that.  There's no disagreement.

9            When we then turn to a digital input into the system,

10   the specification tells us precisely what to do, replace the

11   encoder and put in an MPEG2 transport demultiplexor and delete

12   the encoder.

13           So I'm not sure I could come up with a better example

14   of a clear linking from a specification telling us when I

15   perform X function, I take what the parties seem to agree as

16   one for -- in one scenario and I replace it with another.  It's

17   express.

18           In contrast, the structures to which TiVo points,

19   first -- the first of them is a black box, input module 101.

20   That plainly does not convey any structure.  There's no

21   specificity whatsoever.

22           And TiVo also said it includes a demodulator.  There

23   is no demodulator in the '389 patent.  They added it later in

24   new matter in 2001.  But -- and TiVo's briefing says, well,

25   it's inherently there.  That may or may not be true, but the

1    Federal Circuit both Atmel and the Biomedino case say that's

2    not sufficient.  It needs to be physically present in the

3    specification.  The patent needs to tell you what the structure

4    is and clearly link it to the function.  So it can't be simply

5    black box 101 and a non-existent supposedly inherent

6    demodulator.

7         When we turn to the '472 and '476 patents, the claimed

8    functions differ from the '389.  One of them is -- is fairly

9    similar, and that's the passing the input signal in '472 or

10   creating a transport stream function in '476.  And for those,

11   we put forward the same arguments as to the MPEG encoder or

12   MPEG2 transport demultiplexor.

13        But it also adds -- the '472 and '476 claims, the

14   parties agree, add an additional function, and that's acquiring

15   an input section.  And so what does the specification tell us

16   is the structure that requires the input signal?  We agree here

17   that the answer is a demodulator.  That -- that is present in

18   the new matter that was added in the '472 and '476.

19        And then TiVo says, well, it's also tuners 201 through

20   204.  Those are, again, black boxes.  These are not structures

21   that are defined there with just those -- those few words.  So,

22   instead, what Samsung is pointing to is the specific

23   specification passages that describe those tuners, and they do

24   so similar to how Mr. Storer -- or Professor Storer described

25   the structure of input section.  It is television tuners for

```
 1    receiving television broadcast signals in various television

 2    standards formats.

 3            So if we're going to -- it can't simply be tuners 201

 4    to 204.  That tells us nothing.  The specification describes

 5    what it -- the structure actually is for performing this

 6    function.

 7            And with that, I think I'll sit down unless Your Honor

 8    has any questions.

 9            THE COURT:  No, counsel.  I think you're pretty clear

10    on your client's position.

11            Let me hear a response from Plaintiff.

12            MR. IANCU:  So thank you, Your Honor.

13            First of all, module is not a claim element here.

14    This is input section.  It's true, a figure does say input

15    module, but the claim limitation, which is what matters here.

16    And most of the places in the specification is input section,

17    and that is not a nonce word.  That has been construed.

18            Now, even the word "module" is not always a nonce

19    word.  Specifically, any word that Courts have identified as

20    nonce words sometimes are not nonce words, and the -- the

21    argument varies based on -- the construction varies based on

22    the specific -- the patents they appear in.

23            For example, the word "device" was construed in the

24    past as a nonce word by the Federal Circuit, but the Federal

25    Circuit has also said in the Inventio case that the phrase
```

 1   "modernizing device," it's a very specific kind of a device, is

 2   not a nonce word.

 3         So here, not only do we not have module in the claim,

 4   but it's clear that whatever it is, the input section itself is

 5   a known thing.  And as the Court said, it's the part of the

 6   device that -- that accepts inputs.

 7         The key here, Your Honor, for the construction in this

 8   case is that there is nothing new in the record since the Court

 9   construed the term in the first case.  The -- for example, the

10   deposition testimony from Inventor Jim Barton they point to is

11   from 2005.

12         And the original Markman case, the reason the Court --

13   the Supreme Court said that claim construction is a matter of

14   law for Courts to decide is to impart uniformity and stability

15   to the meaning of claims in patents.  So if we can vary the

16   same term from case to case in the same exact Court for the

17   same patent, especially when nothing really has changed in the

18   intrinsic record, the whole purpose of the Markman decision

19   from the Supreme Court is to a large extent vitiated.

20         THE COURT:  Let me ask you this, counsel.  You --

21   you've argued that 112(6) does not apply, and, of course, your

22   opponent has argued that it does.  And then he's laid out for

23   me what he believes the function and structure would be in the

24   applicable claim language if the Court were to construe this

25   pursuant to Section 112(6).

1          I know it's your position, and I understand your

2    argument as to why that's not the case, but just so we have a

3    complete argument in the record, if the Court were to construe

4    this under 112(6), how do you differ from what your opposing

5    counsel's presented with regard to both function and structure?

6          MR. IANCU:   So the biggest problem with their

7    construction is that they include a demultiplexor.

8          If we could go to Slide 51, please?  I'll go get my

9    clicker.

10         And you see in the highlighted passages at 3:30 to

11   3:61 and 6:26 to 35, the demultiplexor appears as an example

12   excerpted at the bottom of Slide 51.  And what is clear is that

13   the specification says this is a condition.  If a digital

14   signal is being processed and you send interleaved signals, in

15   that case, you might add a demultiplexor.  And the law is

16   crystal clear that the Court cannot import into the claim

17   features that are unnecessary to perform the claimed function.

18         And here the function is -- even -- even assuming that

19   this is a means-plus-function term, which, again, we don't

20   agree, but the function that Samsung articulates is converting

21   said specific program to an MPEG formatted stream for internal

22   transfer and manipulation.  That is not what the demultiplexor

23   does.

24         The demultiplexor separates, demultiplexes the -- the

25   input stream that's being acquired.  So not only isn't it

1    necessary, it doesn't even perform the -- the function at -- at

2    issue here.

3              THE COURT:  All right.  Anything else?

4              MR. IANCU:  That's it on our side, Your Honor.

5              THE COURT:  All right.  Well, let's consider that that

6    concludes argument on input section.

7              And let's go next to media switch.  Again, I

8    understand this is a TiVo term, so let me hear from TiVo on

9    this.

10             And let's start off, counsel, with the same question.

11   Do you agree that the issues here are the same across the

12   patents-in-suit, the '389, the '472, and the '476?

13             MR. HABER:  Yes, Your Honor.

14             THE COURT:  Okay.

15             MR. HABER:  Benjamin Haber for TiVo.  It is our --

16   TiVo's position that the "media switch" term should be

17   construed the same way in each of the patents.

18             THE COURT:  All right.  Let me hear your argument.

19             MR. HABER:  And we have on Slide 91 just the patents.

20   And what you'll note is that the '389 patent and the '472 and

21   '476 patents are related.  And the "media switch" term appears

22   in each of them.

23             And the "media switch" term itself, the smaller term,

24   "media switch," was construed by this Court in its EchoStar

25   decision as hardware and/or code that mediates between a

1    microprocessor, CPU, hard disk or storage device, and memory.

2    And it's TiVo's position that that construction should apply in

3    each of the three patents at issue.

4            As far as the smaller term goes, "media switch," the

5    parties substantially agree that that is the meaning of a -- of

6    a media switch.

7            Samsung seeks to import additional limitations into

8    the construction of media switch, specifically the parse and

9    separate limitations.

10           THE COURT:  Haven't the parties agreed that parse

11   means analyze?

12           MR. HABER:  Yes, the parties have agreed that parse

13   means analyze, and the parties have also agreed with regard to

14   the "separate" term in the '389 patent.  And so there really is

15   not any dispute as to those terms.

16           Samsung, however, insists that media switch must be

17   understood in the context of the larger phrase in which it

18   appears in the '389 patent.  We don't believe that that is

19   correct.

20           Media switch itself has its own definition that was

21   provided by this Court in EchoStar.  That's what's stated --

22   what's stated here.

23           And if we go to the '389 patent -- I'm on Slide 95 --

24   you can see media switch appears there, as well.  And then

25   there is an additional wherein clause that says:  Wherein said

1   media switch parses said MPEG stream, said MPEG stream is

2   separated into its video and audio components.  So parse and

3   separate are separately recited elements in Claim 31.

4         Now, if you look at Claim 1 of the '472 patent, for

5   example, the same term "media switch" appears, but the

6   limitations, parse and separate, do not appear in Claim 1 of

7   the '472 patent or in Claim 1 of the '476 patent.

8         And what Samsung is asking this Court to do is import

9   those limitations from Claim 1 of the '389 patent into Claim 1

10  of the '472 and '476 patents, which don't actually recite them.

11        Now, it's settled law that that is improper.  You do

12  not import claim limitations from one claim into another when

13  that claim does not recite them.

14        So for that reason, it is TiVo's position that media

15  switch in each one of the patents should be given the same

16  construction, and that is the construction that was provided by

17  this Court in EchoStar.

18        Unless there are any questions, I will reserve time

19  for rebuttal.

20        THE COURT:  All right.  Let me hear a response from

21  Samsung.

22        MR. GRAUBART:  Thank you, Your Honor.

23        And -- and in one sentence on input section, Mr. Iancu

24  said nothing had changed.  Williamson v. Citrix has changed,

25  Your Honor.  The law is different.

1              Turning to media switch, Mr. Jhurani.  Thank you.

2              The disputed issue here is whether the media switch

3      performs parsing and separating in both -- excuse me, in all of

4      the '472, '476, and '389 patents.  The parties do agree that it

5      should be construed consistently.  And consistent with what

6      TiVo has repeatedly told this Court and the Federal Circuit,

7      the invention that TiVo filed its patent application on in 1998

8      was a media switch.  It included a media switch that must

9      physically separate the video and audio components of the

10     stream.

11             Before I talk further about where the parties

12     disagree, I want to at least reiterate some areas that the --

13     the parties are in agreement.

14             So we see that the media switch is in the heart of the

15     invention here in Figure 1.  You see it sits between multiple

16     components.  And as TiVo will concede -- in some claims, at

17     least, TiVo agrees that it performs this physical separation.

18     A signal comes in, media switch parses it, and then separates

19     it out into its audio and video components.

20             Again, another area the parties agree is that this is

21     a -- a coined term, made up.  It had no ordinary meaning to a

22     person of ordinary skill.  Multiple inventors over and over

23     conceded readily that, yeah, this is something they coined.

24     As, of course, they're entitled to do.  They act as their own

25     lexicographer.  But we know that they're -- this has no plain

1    and ordinary meaning to a person of ordinary skill.

2           Samsung's expert agrees, but what's more important

3    that you don't see on this slide is TiVo's expert doesn't

4    disagree.   There is no -- no expert opinion that this has some

5    sort of ordinary meaning in the art.

6           So as a result, we have to look to the specification

7    and understand what the specification -- how it defines this

8    term.   That's what the Federal Circuit told us in the 3M

9    Innovative Properties case.   And here it's pretty easy to know

10   what the specification tells us about this.

11          TiVo's told us over and over.   Over and over, TiVo has

12   said this is not some tangential limitation in just some

13   dependent claims or something.   This is the heart of the

14   invention.   Mr. Chu, during opening statements in the EchoStar

15   trial, told the jury that this was the heart of the invention,

16   it was its brains and its brawns.   And TiVo also takes the

17   position that in the '47 -- the '472 and '476 patents claim

18   priority to the '389 patent that was at issue there, that it's

19   the same invention.   It also finds its disclosure in the 1998

20   invention.

21          And so all we're asking is that the Court hold TiVo to

22   its word, that the -- the invention, this media switch from the

23   1998 specification, is the thing that performs physical

24   separation of video and audio data.

25          As you see on this Slide 55, in TiVo's appellate

1  brief, they said it's in the heart of the device and the media

2  switch parses the MPEG stream which is separated into its video

3  and audio components.  But much more forcefully, at oral --

4  oral argument, TiVo's appellate counsel, Seth Waxman, said --

5  and this is crucially important -- the media switch has two

6  functions, okay?  One is that it parses said MPEG stream, and

7  the other is that the MPEG stream is separated into its video

8  and audio components.  And Mr. Waxman went on to say that's the

9  genius.  The core of this invention is the separation.

10        THE COURT:  Mr. Waxman has not appeared in this case.

11        MR. GRAUBART:  He has not, Your Honor.

12        THE COURT:  Okay.

13        MR. GRAUBART:  And all we're asking is that the Court

14  hold TiVo to its word in its statement to the Federal Circuit.

15  The Federal Circuit -- in that case, there was a dispute about

16  whether the separation needed to be physical or could only be

17  logical.  And TiVo said that, well, there is one embodiment

18  where it's physical, but that's merely a preferred embodiment.

19  And that's Figure 3 here.

20        Well, the Federal Circuit looked at Figure 3 and said,

21  no, no, this is a required aspect of the invention.  But not

22  just here in Figure 3.  Again in Figure 4, the media switch at

23  the heart of the invention is described as operating the

24  video -- on video -- separate video and audio buffers.

25        The Court moved on to Figure 5.  Once, again,

1    underscoring that the media switch separates the video, audio,

2    and private event data packets.

3            And then finally again in Figure 7, the Court said the

4    specification unambiguously describes the parser and the media

5    switch as doing this detecting, and then the -- the video and

6    audio components processed by the media switch are separated.

7            So at end of the day, the Federal Circuit looked at

8    TiVo's own statements and the patent's own statements and said

9    this is the invention.  This is the present invention.  And I

10   know Your Honor hears that argument a lot that, oh, the

11   specification says present invention, and we must limit it.

12   And admittedly, the Federal Circuit is a little hard to read on

13   whether -- when that matters or not.

14           Here, we already have the answer.  The Federal Circuit

15   told us that in this patent, the phrase "the invention parsing

16   and separates by the media switch," that limits the invention

17   as a whole.

18           And, again, in this case actually TiVo has taken

19   positions that -- that further underscore that.  Your Honor

20   might remember that we had one discovery dispute related to

21   whether TiVo would have to provide an interrogatory response

22   providing its written description support for its claim that

23   the '472 and '476 patents find priority in the original

24   specification.  So once Your Honor compelled them, TiVo, for --

25   in the '472 and '476, you'll see that media switch has a bunch

1    of additional subcomponents that are recited.  One of them is

2    this multimedia data stream processor.

3          What does TiVo rely on as support for the supposed

4    support in the '389 specification for that processor?  That

5    very same "the invention" language that the Federal Circuit

6    told us requires the media switch to physically separate the

7    audio and video data.

8          So here, even in these additional claims, TiVo's

9    relying on the very same passage to tell us that the media

10   switch is described as performing this -- this separation.

11         TiVo says we're improperly importing from the '389 to

12   the '472 and '476.  To the contrary, I'd say, Judge, it's not

13   Samsung that's telling you to do this.  It's the patent.  It's

14   TiVo's statements to the Federal Circuit.  It's the Federal

15   Circuit finding about what media switch is.  This is not an

16   importation.  This is holding the patentee to its word and

17   using the consistent term "media switch" across all three

18   patents to have the meaning that the Federal Circuit found.

19         The SRI case was a very different situation involving

20   dependent claim limitations that the Court said shouldn't be

21   read up into the independent, and it doesn't apply here.

22         TiVo's last argument is that, see, there are some

23   claims that don't have anything to do with the separating and

24   parsing the so-called software claims of the '389 patent, but

25   those don't have any media switch at all.  They are the

1  particular object-oriented software implementation, but

2  wherever there's a media switch, we know that that media switch

3  is defined as parsing and separating.

4          And very lastly, TiVo's construction is that this is

5  merely a -- an element in a hardware configuration that

6  mediates between various other elements.  And if -- if Your

7  Honor looks at their infringement contentions, they -- TiVo

8  reads this on virtually any piece of hardware that receives

9  inputs and outputs data.  Graphics processors, camera

10 processors, display subsystem processors.  It's lost all

11 meaning whatsoever in TiVo's -- under TiVo's construction.  And

12 when, in fact, they repeatedly told the Federal Circuit it's

13 the heart of the invention, and the Federal Circuit found that

14 that heart was separation.

15         THE COURT:  All right.

16         MR. GRAUBART:  Thank you, Judge.

17         THE COURT:  Thank you, counsel.

18         A response from Plaintiff?

19         MR. HABER:  Thank you, Your Honor.

20         A few quick points.  The first was that the original

21 EchoStar trial involved the '389 patent which included claims

22 that had the -- this language in it, parse and separate.  The

23 claims at issue here, the '472 and '476, don't have those claim

24 elements recited.

25         Additionally, the issue on the appeal in EchoStar was

1    not whether the media switch required a separating step.  It

2    was whether or not separating, as recited in the '389 patent,

3    required physical separation or a logical separation.

4            Now, the appellate Court considering that issue found

5    that physical separation was required, as opposed to logical

6    separation, but it didn't hold that the media switch actually

7    had to perform separating.

8            And additionally, Samsung characterizes the

9    specification as stating that the media switch must separate.

10   But actually the specification is very clear, saying what the

11   media switch does.  If you look at Column 3, Lines 62 through

12   65, it says:  The media switch 102 mediates between a

13   microprocessor, CPU, hard disk or storage device, and memory,

14   period.  And that is the construction that this Court applied

15   in EchoStar, and that is the construction that this Court

16   should apply here, as well, for all three patents.

17           THE COURT:  All right.  Thank you, counsel.

18           MR. HABER:  Thank you, Your Honor.

19           THE COURT:  Let's move on to media manager, and I'll

20   hear from TiVo on this term.

21           MR. HABER:  I will stay here then.  I'm going to be

22   talking about the "media manager" term.

23           If we could go to Slide 114.

24           So Samsung contends that the term "media manager" is

25   indefinite.  The standard for indefiniteness is here on Slide

114.

What the Supreme Court held in Nautilus, claims are not indefinite when claims viewed in light of the specification and prosecution history inform those of skill in the art about the scope of the invention with reasonable certainty.

Thank you.

Now, let's look at the claim.  What the claim says is that there is a media switch which comprises a media manager. Pretty clear.  The claim states that the media switch includes a media manager.

Samsung argues that the claim is indefinite because one of skill in the art would not understand that a media switch can comprise a media manager.  In view of the claims, that argument does not hold water, and certainly they have not provided clear and convincing evidence that one of skill in the art would not understand the scope of this claim with reasonable certainty.

Unless there are questions, I'll reserve time for rebuttal.

THE COURT:  I don't have any questions at this point.

Let me hear a response from Samsung.

MR. GRAUBART:  Thank you, Judge.

Thank you.

So as -- as Mr. Haber said, this -- this term appears in the '472 patent's independent claims.  And I would agree

1   that if we look just solely at this language in isolation -- in

2   a vacuum, it is understandable.  The claim says you have a

3   media switch, and that media switch comprises a media manager.

4   And then it tells us that that media manager has a host of

5   subcomponents like a DMA controller, host controller, et

6   cetera.

7           But the Federal Circuit in Phillips says we don't read

8   claims in their isolation.  We need to read them and interpret

9   them in the context of the specification of which they're a

10  part.  And when you look at the -- this patent as a whole, as

11  well as related patents, you'll find that a person of ordinary

12  skill would have no idea what is or is not a media manager.

13          And I'll show you why, Your Honor.  First, we know

14  that the -- the '472 patent specification, the first 13

15  figures, these were all from the old matter that were filed in

16  1998.  And they all are based on this architecture where the

17  media switch sits at the middle, in kind of a hub and spoke

18  kind of scenario where it's right in the data path between the

19  input and the output.

20          On the other hand, in 2001, TiVo filed a

21  continuation-in-part application that had also a very different

22  architecture, and that's this in Figures 14 through 22.  First

23  of all, you'll notice there's no media switch here.  Instead,

24  we have a media manager.  And this media manager sits outside

25  that data path between the input and the output.  And as a

1   result, TiVo's inventors explain that, yeah, it was a very

2   different architecture.  You couldn't just simply replace the

3   media switch with the media manager, and they're -- they're

4   just very different components.  It wouldn't have worked if you

5   had just switched it, they said.

6          And so the specification establishes that these are

7   mutually exclusive.  TiVo says, well, they both are related.

8   They both perform mediation, and, therefore, the media manager

9   can just be part of the media switch.  But that actually kind

10  of begs the question, well, why would we have two different

11  components in the same claim to perform this -- this exact

12  function?  You wouldn't, in fact, because the specification

13  never describes such a scenario where you would have both.  And

14  it wouldn't have made -- made any sense to it.

15         So what we have here as a claim -- as I said, does

16  make some sense on its face, but it stands completely at odds

17  and completely irreconcilable with the specification's

18  description of what a media manager is.

19         And in the Allen Engineering case where the Federal

20  Circuit considered a mechanical invention that had -- in the

21  specification, it said something could not pivot in a

22  perpendicular plane, and then the claim said must pivot in a

23  perpendicular plane, the Court said that's invalid as

24  indefinite under Section 112 Paragraph 2.

25         But there's also a second reason independent of that

1   contradictory position between the spec and the claims, and

2   that's that if you look at the juxtaposition of claims -- of

3   the claims in the '472 and the '476 patents, which are here on

4   Slide 74, the only real difference is that one of them has a

5   media manager.  They both say you have a media switch,

6   including these four subcomponents.

7        And so how do we -- how is a person of ordinary skill

8   to know, particularly based in light of the -- the complete

9   contradiction with the specification, when there is a media

10  manager or when there isn't?  It would leave a person

11  completely unsure as to what the scope of media manager is.

12       And, finally, just to underscore that, you know who

13  else is unsure about what a media manager covers?  TiVo.

14  TiVo's position on what its products -- which of its products

15  are covered by the '472 patent, as opposed to the '476 patent,

16  which as I say, the only significant real difference there is

17  the -- the addition of a media manager in '472.

18       First they said, oh, yeah, all our products covered --

19  are covered by all the patents-in-suit.  Six weeks later,

20  scratch that, not all of them, all of them but the Series 1.

21  Six weeks later, we throw up our hands and say we really just

22  don't have any idea.  We can't say at this stage of the case.

23       And I don't see how construing media manager as simply

24  part of a media switch, which would have been TiVo's position

25  all along when it filed this lawsuit, would somehow leave it

1  able to figure this out.  There's just no way to square it,

2  Your Honor.  And for that reason, we ask that the Court hold

3  that the claims of the '472 patent are indefinite.

4        THE COURT:  Let me confirm, counsel, that Samsung did

5  not supply an alternative construction in the event the Court

6  disagrees with you that it's not indefinite?

7        MR. GRAUBART:  I think that's right, Your Honor.

8        THE COURT:  You've -- you've hung your hat on that one

9  nail?

10        MR. GRAUBART:  Yes, I have.

11        THE COURT:  Okay.

12        MR. GRAUBART:  Thank you.

13        THE COURT:  Let me hear follow-up from TiVo.

14        MR. HABER:  If you can go to Slide 107, please.

15        So Samsung is presenting an indefiniteness argument.

16  In an indefiniteness argument, you have to look at the claims,

17  you have to look at the scope of the claims.  And here the

18  claims are very clear.  The claim says:  A media switch

19  comprising a media manager.  The claims also tell us what the

20  media manager includes, host controller, DMA controller,

21  plus --

22        THE COURT:  Slow down just a little bit, Mr. Haber.

23        MR. HABER:  I apologize.

24        They tell us what the -- the media manager includes, a

25  host controller, DMA controller, bus arbiter, multimedia data

1    stream processor.  And the specification also explains what the

2    media switch does, mediates, and further explains that the

3    media manager provides a number of functions, which is the

4    bridging and mediating functions, to a number of different

5    interfaces.

6              So what we have is a specific embodiment of the media

7    switch which includes a media manager for mediating and

8    providing certain components.  And the claim is clear on its

9    face as to what that is.

10             Now, Samsung's argument about which products practice

11   the '472 and '476.  The -- the reason that there were some

12   changes that were made were really about claim construction

13   disputes that have since been dropped.  For example, there

14   were -- Samsung presented a -- a claim construction for

15   multimedia data stream processor, so the -- the scope of some

16   of these subsidiary terms was at issue, so TiVo was not willing

17   to say one way or the other under all the proposed claim

18   constructions as to practice of these terms.  But Samsung has

19   subsequently dropped those constuc -- constructions, and -- and

20   there's really no question anymore.

21             So I think -- absent anything else, I think -- I think

22   we're concluded.

23             THE COURT:  All right.  Thank you.

24             All right.  Let's go on to the first of the two

25   Samsung terms to be argued today, that being channel changer,

1  channel selector, from the '043 patent and the '333 patent.

2  Let me hear from Samsung on this term or terms.

3          MR. GREEN:  Good afternoon, Your Honor.  Christopher

4  Green for Samsung.

5          THE COURT:  Good afternoon, counsel.

6          MR. GREEN:  Thank you for having us here today.

7          THE COURT:  My pleasure.

8          MR. GREEN:  I'm sure there's nowhere else you'd rather

9  be right now.  We'll make this as quick as we can.

10         Channel changer, graphical channel changer, channel

11 selector, graphical channel selector, all together, Your Honor,

12 from the two patents, '043 and '333 patent.  And just for one

13 moment of context, the way that these patents made their way

14 into the -- into our collective consciousness, if you will, is

15 if you go back to 1996, when they were filed, you may remember

16 the old cable systems, you had maybe not as many channels as

17 you have now, but you had a lot of channels, and you'd have

18 this old scrolling guide, and so you'd have one channel you

19 could tune to, and it would be this kind of rolling -- like a

20 rolling credits kind of thing.  And if it was on Channel No. 7

21 and you wanted to see what was on Channel No. 5, you had to

22 wait for Channel No. 5 to come back around.

23         So the improvement is this programming guide allowed

24 a -- an interactive experience.  It allowed users to better

25 find and locate the channels that they want and then tune right

1    to the -- right to the Baylor game or the Texas game or the

2    Georgia Tech game, my -- my alma mater, or whatever it is you

3    want to watch, you don't have to wait for this whole guide to

4    scroll around.

5            So with that, let's jump right into the disputes.  If

6    we go to Slide No. 10, excuse me.  I'm battling Mr. Jhurani

7    here.

8            Here are the three disputes for the "graphical channel

9    changer" terms, Your Honor.  The first is whether a graphical

10   channel changer is more than a mere list.

11           The next is whether the graphical channel changer is

12   required to be independent of an electronic program guide or --

13   or be any program-specific information, or whether that

14   programming guide -- I'm sorry, the graphical channel changer

15   can be part of and incorporated within the programming guide.

16           And then the -- the third dispute is whether the

17   graphical channel changer allows a user to select and tune to a

18   particular channel.

19           So let's jump right in, and let's start at the top

20   with the graphical user interface element.  The plain language

21   of the claims themselves required the program guide to include

22   channel objects.  You see Claims 1 and Claims 19 -- excuse me,

23   Your Honor, I'm going to pass those up.  Thank you.

24           THE COURT:  Go ahead.

25           MR. GREEN:  Claims 1 and 19 -- and I'm looking at

1    Slide No. 11 of our presentation.

2           Channel objects are required to be part of the

3    graphical channel changer.  And channel object is not a term

4    that you hear every day, but if we look on the next slide,

5    that's Slide No. 12, we see a description of what channel

6    objects are.  A graphical channel changer, reading from the

7    excerpt on the top of the side, has a vertical channel bar that

8    includes graphical channel boxes.  When Your Honor and your --

9    and your -- and your staff have read the patents, you've no

10   doubt come across this channel boxes term.  That's the channel

11   object.  Again, graphical elements that comprise the graphical

12   channel changer.

13          If we go to the next slide, Slide No. 13.

14          And what we see is we see some -- some additional

15   context.  Here highlighted with a red rectangle and some blue

16   highlighting on the right side of the slide, we see some

17   familiar network call signs, ABC, NBC, CBS, Fox, Disney

18   channel.  The blue boxes are those channel boxes or the channel

19   objects that are referenced in the claim.  And they have things

20   like a channel name and a channel number.  That allows a user

21   to -- to filter or sort in some ways, or at least know what it

22   is you're going to look at.  And then the red rectangle that --

23   that surrounds it all, all of those things together make the

24   channel changer.

25          So what we have is a graphical channel changer

1    comprised of these -- these channel boxes or channel objects

2    using the language of the claim.

3         Now, let me step back, Your Honor.  If I may, what we

4    see here is maybe the -- the confluence of our first dispute.

5    There is -- you could call this a list of information, but this

6    is not merely a list.  It is some information about the

7    channels and their names and their numbers, but that's not all

8    that this is.  It's not -- the term in the claim is not

9    graphical channel list.  The term is graphical channel changer.

10        And let's look at that a little bit closer.  So the

11   reason it's something more is because if we move on to Slide

12   No. 14, then we see we see a discussion of how an electronic

13   programming guide is based on the graphical channel changer.

14   And this is one of our other disputes.

15        TiVo suggests and argues that this graphical channel

16   changer must be independent of the programming guide.  And I'm

17   not -- I'm not even sure how one would measure that, but it's

18   clear from the specification that that's not the case.  The

19   electronic programming guide is based on the graphical channel

20   changer.

21        And if we step down to that second highlighting here

22   on Slide No. 14, we see in addition to the channel changer 800,

23   the programming guide 900 comprises.  And we all know what the

24   word "comprises" means.  It's one of those magic words in

25   patent law.  So we see that the graphical channel changer is

1    part of the programming guide, not independent or separate from

2    it.

3         If we're looking for still more evidence that this

4    graphical channel changer is, in fact, part of the programming

5    guide -- and we can go to Slide 15.  And we see two figures.

6    These are Figures 6 and 7 from the '333 patent.  On the left

7    slide -- left side of Slide No. 15, we see the graphical

8    channel changer in isolation.  And then on the right side, we

9    see the graphical channel changer as part of the programming

10   guide.

11        Now, you'll notice, because we've connected these

12   things up, every element that is in the graphical channel

13   changer, when shown in isolation, is also present in the

14   graphical -- I'm sorry, the electronic programming guide, the

15   channel bar, the channel changer itself, and all the channel

16   boxes that comprise the channel changer.  There's no

17   separation.  There's no need for logical, physical, or any

18   other kind of separation, Your Honor.  These are one and the

19   same.

20        It's not just those figures.  If we look at Figures 9

21   and 10 from that same '333 patent, then we see this same

22   concept.  We see two big red rectangles, all which enclose a

23   graphical channel changer on the left side, some programming

24   information that's part of the larger programming guide.

25   Again, no logical separation, no physical separation, all one

1   and the same.

2          We step still further on to Slide 17, and this is just

3   a pause for a moment just to confirm that the '043 patent and

4   the '333 patent have the same disclosure.  They -- they -- they

5   originated from a common provisional application.  On that

6   right side of Slide 17, we see the familiar graphical channel

7   changer with the channel boxes.

8          And if I move on to the next slide, Slide 18, again,

9   we see the figures are virtually identical, and I think this

10  just reinforces why the parties have agreed all of these terms

11  from both patents, they need to have the same construction.

12         Again, we see that information in these graphical

13  channel changers, you could -- you could consider it to be a

14  list, if you wanted to, but it's not just a list.  It's not

15  merely a list.  It's part of something larger.  So let's talk

16  about what that something larger is.

17         A big part of it is -- looking at Slide No. 19 -- the

18  ability to select and tune to a channel.  This comes from the

19  plain language of the claim.  The graphical channel changers or

20  the channel changer in this instance enables a user to select a

21  TV channel.  And we're not going to select it just -- just for

22  the heck of it.  We're going to select it for viewing.

23         If we move on to Slide 20, then we see that the

24  specification is going to tell us that a graphical channel

25  changer is for this exact purpose, selecting and tuning.  The

1    top excerpt on Slide No. 20 says:  The graphics on the TV set

2    may represent a graphical channel changer that enable a user to

3    select TV channels.  But we don't stop there.

4         If we go to the bottom excerpts, we see that when a

5    user hits a select button on a remote control, then the central

6    processing unit in this television system is going to send a

7    command, a tune command to an RF tuner, and it's going to tune,

8    in this case, a satellite receiver -- doesn't have to be a

9    satellite receiver, but it's going to tune a satellite receiver

10   to a required TV channel.  So we're not stopping with just the

11   act of highlighting or selecting.  We're actually impacting the

12   operation of the circuitry and the hardware in this system to

13   cause the tuning -- the selection and tuning of a television

14   channel.

15        THE COURT:  A minute ago you used the phrase, "we're

16   not just going to select it, we're going to select it for

17   viewing."  Is selecting for viewing the same thing as tuning?

18        MR. GREEN:  I would argue, Your Honor, that unless the

19   channel you select happens to be the one that the television is

20   already tuned to, then there will be a tuning operation,

21   because -- and if you have a system that's receiving more than

22   one channel, then selecting a channel or selecting a program is

23   going to require you to identify the signals that carry the

24   audio and the video and anything else goes with rendering the

25   images of that program on the screen.  So you're going to have

1    to impact and cause the circuitry of the system to extract,

2    obtain, whatever verb you would like to use, that information

3    and cause that program to be available to the user.

4            THE COURT:  So selecting for viewing as used a minute

5    ago is not the same thing as tuning.

6            MR. GREEN:  I did not mean -- oh, selecting is not --

7    selecting is not the same thing as tuning.  Those are not

8    redundant terms.

9            THE COURT:  I understand that, but you said a minute

10   ago, we're going to select that, and we're not just going to

11   select it, we're going to select it for viewing.

12           MR. GREEN:  That's correct.

13           THE COURT:  And I thought you meant you'd crossed the

14   line between selecting and tuning when you said that, but I'm

15   trying to make sure whether you meant that or not.

16           MR. GREEN:  I -- I mean to say that if you select for

17   viewing, it's the same thing as tuning.

18           THE COURT:  Okay.

19           MR. GREEN:  Thank you for that, Your Honor.

20           If I move on to the next slide, Your Honor, then we

21   have made it to the -- I guess the -- not the lowest, but a

22   third rung of the intrinsic evidence record.  It's never really

23   been in doubt.  It's never been contrary to the patentee's

24   intentions that these '333 and '043 patents were intended to

25   select and tune.  Here we see a brief discussion of a prior art

1    reference called the Miller reference.  It was cited against

2    the '333 patent in prosecution.  The distinction that was made

3    to overcome the Miller reference, as shown in the highlighting,

4    is that the Miller reference did not function to change the

5    channel to the desired station.

6             So, again, selecting by itself wouldn't get you all

7    the way to -- to changing a channel.  That requires a tuning

8    operation.

9             I have some additional points to be made.  Maybe I'm

10   making them in the abstract, given that we haven't heard from

11   our colleagues at the other table yet, but this may be worth

12   just going ahead and preempting then.

13            The first is, Your Honor, I've mentioned several

14   times.  These graphical channel changers are not merely a list.

15   I believe that is a litigation driven position.  I get it.  We

16   all do these kinds of things.  But here, I believe it's

17   incorrect.  It's intended to bolster TiVo's pending 101 motion,

18   but -- but these graphical channel changers are not just lists.

19            If we look to the -- the second bullet, we see that

20   TiVo itself is going to acknowledge that a channel changer is

21   intended to be part of a -- a graphical user interface.  So

22   that gets us a little bit further down the road to the -- to

23   the correctness of Samsung's construction -- construction,

24   rather.

25            And the third point is that the channel changer, just

1   because it includes a list, doesn't mean it's going to be a

2   list.  We see from the excerpt that the graphical channel

3   changer 800 allows the user to include any combination of TV

4   channels into a channel list to be displayed.  But that's not

5   all the channel changer does.  So we're not trying to run away

6   from the fact that you can list information in that channel

7   changer.  We are saying that's an incomplete recitation of what

8   a channel changer is.

9           THE COURT:  All right.  What else, counsel?

10          MR. GREEN:  There's so much more, Your Honor.

11          THE COURT:  We have so little time.

12          MR. GREEN:  I know.

13          The -- the last piece is we -- we were accused -- and

14  I'll say unfairly -- of having a construction that is

15  unbounded.  It's not.  Just because we have the term "graphical

16  user interface element," that doesn't mean we're trying to read

17  this on any -- any element of the graphical user interface.  We

18  are speaking specifically to a channel changer that is

19  constructed from channel objects.  The channel objects have

20  channel name, channel number information, and then we have the

21  selecting and tuning operation, so there is specificity here.

22  This is not one of those situations where the construction is

23  maybe worse than the original claim language or at least no

24  more certain.

25          And with that, Your Honor, I'll sit down and reserve

1   the balance of any time that we have, precious little though it

2   may be, for rebuttal.

3           THE COURT:  All right.

4           MR. GREEN:  Thank you.

5           THE COURT:  Let me hear from TiVo in response.

6           MR. GORDON:  Good afternoon, Your Honor.  Josh Gordon

7   for TiVo.

8           THE COURT:  Proceed, Mr. Gordon.

9           MR. GORDON:  Thank you.

10          If we could go to Slide 3 of the...

11          So, Your Honor, because this term has not been

12  construed before, indeed these patents have never been at issue

13  before, it makes sense to step back a few feet and talk briefly

14  about the purpose for these patents as stated by the patentee

15  in the specification.

16          These two patents are related, as counsel informed you

17  previously.  They also, as he informed you, share a common

18  priority to a provisional application filed August of 1996.

19          The '043 patent generally covers customizing, what we

20  call a list of TV channels.  I'll get into that.

21          The '333 patent covers sorting those list of TV

22  channels.

23          These patents addressed very specific perceived

24  problems in the art, and the patentees acknowledged that the

25  art contained related functionality, including electronic

1   program guides.  And they noted that in a conventional TV GUI,

2   graphical user interface, substantial time and effort to

3   require a customized list of channels.  And also noted a

4   perceived problem that if you customize a list of channels, you

5   might end up with a format on the screen that's different than

6   where you were before.

7           They thought that was a problem, and they decided to

8   fix -- fix that specific problem with this claimed channel

9   changer.  And how they did that was they claimed a regular

10  channel changer in which the user could see all the available

11  channels and a customized channel changer in which the user

12  could see a subset, a selected list, presumably smaller than

13  all the available channels.  And the idea that these two

14  channel changers have the same configuration, so the user is

15  not confused once they go from all the channels to a subset of

16  channels.

17          With the '333 patent, they noted that there are TV

18  guides.  And TV guides present a list of available channels and

19  programs that may be displayed on a TV screen.  And those

20  channels are typically arranged in the order of number, as we

21  usually see when we pull up a TV guide.  They thought it would

22  be desirable to sort these differently so that the user might

23  access the channel more quickly.  And so they thought it would

24  be usable -- be convenient to present them in a manner more

25  easily searched and desired -- obtained the desired programming

1    promptly.

2         So to fix -- fix that specific perceived problem, they

3    came up with using the channel changer in a different mode.

4    Same channel changer using in a different mode to sort of the

5    channels in different -- in different ways, such as prescribed

6    order based on a name.  Very specific problems in the art, very

7    specific solutions.

8         To do that, they came up with this common channel

9    changer.  We've agreed, counsel has agreed that the definition

10   of this term applies for these patents.

11        On the left, you've got the '043 patent, Figure 6, the

12   channel changer 800 marked in red.  And the '333 patent, Figure

13   6.  Same figure.  Counsel put up very similar -- similar

14   figures before.  We don't have an argument that these figures

15   depict the channel changer in both patents.

16        In the '043 patent, it depicts, again, what we call

17   this list of channels -- the regular channel changer on the

18   left, customized channel changer on the right.

19        In the '333 patent, they depict this very same channel

20   changer, again, marked with 800.  You can see the 800 channel

21   changer right under the top red -- top horizontal line of the

22   red box -- in various ways to sort the channel changer, such as

23   channel name, channel number, and program name.

24        So we do have significant differences in our

25   construction on this term.  TiVo's on the left, a list of TV

1  channels from which a TV channel may be selected that a user

2  may access and navigate independent of an electronic program

3  guide or any program-specific information.

4  So there are three components to this, and I think

5  I'll take them in turn.  The first one, which counsel

6  referenced, is that a user may access and navigate the channel

7  changer independent of any electronic program guide or

8  program-specific information.

9  So counsel noted the provisional application from

10  1996.  He also noted incorrectly, I believe, that in 1996, as

11  of that date, the only available guides to people were what he

12  call the rolling screen, so you had to wait for the screen --

13  the channel you wanted to come back around.

14  THE COURT:  I remember those.

15  MR. GORDON:  I believe that -- I remember those, too,

16  but those predated 1996.  In fact, they predated 1993.  As of

17  1993, the familiar grid-like guide had been introduced.  And as

18  of this 1996 provisional disclosure, the patentees understood

19  this.  And they stated specifically -- and this is from the

20  '904 application, the August 1996 provisional application to

21  which both of these patents claim priority.  It was taken right

22  from the patentee's language, and in this -- in this

23  application, I should note, there's an invention disclosure.

24  It's not just an application like you typically see filed at

25  the Patent Office.  There are many pages of a Samsung document

1    incorporated into that provisional which is in the -- the

2    invention disclosure written by the -- the inventors.

3            And they say:  The state of the art for graphical user

4    interface for television is electronic program art.  Much prior

5    art is available showing a two-dimensional array of items that

6    show the channels listed vertically and the time listed in the

7    horizontal direction.  And they include this Figure 11 to

8    reflect what they understood -- this is a program guide.  This

9    was not novel.  Much prior art is available showing this, they

10   noted.

11           The novelty of their invention -- and this is stated

12   by the inventors themselves in the provisional application --

13   the novelty of this invention is to, and I quote, break the

14   electronic program guide into two distinct functional modes.

15           And we've inserted a red line on the program guide

16   from that application to show how the inventors, quote, broke

17   the electronic program guide into two distinct functional

18   modes.

19           Mode 1, the channel changer.  This is the term at

20   issue here in this case.  Mode 1 is what we call, in quotes,

21   channel changer and is shown in Figure 10.  The left-hand side

22   of the screen contains a list of channel logos and various

23   scroll bars, and you can see this image from the provisional

24   application, Figure 10, quote, channel changer, just shows the

25   list of channels in vertical order.  This is the exact same

1   figure with minor non-pertinent changes that's depicted in the

2   '043 patent and the '333 patent in Figure 6.

3           THE COURT:  They're showing just the name and the

4   number?

5           MR. GORDON:  Just the name and the number.  And as you

6   can see, they said -- in their words -- Figure 10 shows a

7   display in which the left-hand side of the screen contains a

8   list of channel logos and various scroll bars.  No discussion

9   or depiction of program information.  Channels only.

10          Mode 2, they said we're going to break it into two

11  distinct functional nodes.  That was Mode 1.  This is Mode 2.

12  Mode 2, they wrote, is the traditional electronic program

13  guide.  However, unlike traditional systems, the EPG on the

14  Samsung GUI, graphical user interface, grows out of the channel

15  changer.  So they said by this, we mean that the two-dimension

16  program time period appears instantaneously aligned with the

17  graphics for the channel changer.

18          So what they were trying to do is have a channel

19  changer that you could see the channels that you wanted, and

20  then once you access that and once you defined the parameters

21  of that -- for example, with the channels that you wanted to

22  see in the customized list -- then you take action.  And when

23  you take action, the EPG on the GUI grows out of the channel

24  changer.  And we've animated that to show that it grows out of

25  the channel changer -- the channels that you have on the

1  channel changer to the guide.

2          And as they said, this provides a very intuitive and

3  novel method for the user to quickly and seamlessly go from

4  channel changer mode to the EPG and still maintain contact.

5          THE COURT:  I see where the channel changer might not

6  necessarily include programming information, but is there a

7  clear disclaimer where it says it can't?

8          MR. GORDON:  That it cannot include program

9  information?  No, Your Honor.

10          THE COURT:  It must be just the name and number, as

11  you showed me to begin with?

12          MR. GORDON:  No, Your Honor.  And we don't contend

13  that it cannot be attached to a program guide as the inventors

14  stated here.  Once you're in this Mode 2, and we -- we agree,

15  as is reflected in the '333 patent which -- which claims a

16  programming guide including a channel changer, it can be.  The

17  two can be attached.  The channel changer on the left, the bar,

18  the vertical bar, and the program guide -- program information

19  next to it.  They can be attached to each other.  But that's

20  Mode 2.

21          The inventor specifically said, you know, the novelty

22  of our invention is not just to have the guide, which they

23  admitted was in the prior art, but to have the channel changer

24  that can then transition to an electric program guide.  So,

25  yes, they can be -- the two can be together.

1          Our position is just that they must be able to also be

2     separate, not that they can never be together.

3          And --

4          THE COURT:  Well, is it your construction that they

5     must always be separate?  Not that they can be?

6          MR. GORDON:  That they may be.  Perhaps may was used

7     inartfully, but they can be.

8          THE COURT:  Okay.

9          MR. GORDON:  And back to the transition reflected

10    in -- in the provisional application, Your Honor.  The

11    inventors expressly said that user action was required for a

12    transition from the Mode 1 channel changer to Mode 2 program

13    guide.  And they give a few examples of this type of user

14    action.

15         We've highlighted one here.  They said you can click

16    this guide button or put your cursor somewhere on the screen,

17    and when you took that action, you could go from Mode 1 to Mode

18    2.  And this is a quote from the same specification:  In order

19    for the user to get from Mode 1 to Mode 2, the user had to take

20    some action.  They included this -- this flowchart.  As you can

21    see, is the user over the guide button?  Yes.  We're going to

22    change the color.  And then, yes, we're going to transition

23    state to program guide.  No?  See if something else is

24    happening, in which the user might have indicated we're going

25    to go from Mode 1 to Mode 2.

1              If the two components could never be separate, this

2     transition could never occur.  We must have some distinction

3     for the user to be able to go from 1 to 2 as initially

4     conceived by the inventors.

5              The claims in the specific -- specification are

6     consistent with this -- the inventor's intent to break the

7     electronic program guide into these two functional modes.  They

8     carry this idea throughout.

9              THE COURT:  If you don't mind, counsel --

10             MR. GORDON:  Sure.

11             THE COURT:  -- it's a little hard for me to pick up

12    some of the ends of your sentences.  You're trailing off.  If

13    you could be a little clearer as you finish your sentences.

14             MR. GORDON:  I will actually do that.  Would you like

15    me to go back to the beginning?

16             THE COURT:  No, I would not.  That part's clear.

17             MR. GORDON:  That part is clear.  I will try to do

18    better, Your Honor.  Thank you for that.  I appreciate that.

19             So, as I said, the inventors carried this idea through

20    the '043 and the; '333 patents, as well as a third patent that

21    we reference in our briefing that also claims priority to the

22    same provisional which is incorporated by reference into both

23    specifications, the '043 and '333, same family, '781 patent.

24    I'll talk briefly about that, as well.

25             As you can see, '043 Claim 1, there's no reference to

1    an electronic programming guide here.  There's also no

2    reference to any program information.  It only references TV

3    channels.  Regular channel changer enabling a user to select a

4    TV channel among all the TV channels.  Nothing but programs.

5          The '333 patent does talk about program guide.  And

6    we -- the writing is there.  We don't dispute that.  They claim

7    a program guide, including a channel changer, which, again, is

8    consistent with this idea the channel changer is the bar on the

9    left and the two are together.  The guide includes the channel

10   changer on the left.

11         However, the specification and the figures of the

12   '33 -- '333 patent adhere to the same construct, the same idea

13   that the two elements must be able to exist independently, not

14   that they must always be independent, but that they must be

15   able to exist independently.

16         For example, these two figures, Figure 6 and 7, are

17   from -- both from the '333 patent that claims the guide,

18   including the channel changer.  It also has the same Figure 6

19   with just the channel changer on the left, and it has Figure 7

20   that counsel showed you, I believe, with the two of them

21   together.  And by the two of them, I mean the channel changer

22   with program information to form the guide.

23         Language from both patents supports this idea --

24   supports TiVo's construction.  On the left, when the user

25   directs the remote pointing device at a graphical button guide,

1    the button I showed you, the circular button I highlighted

2    previously, the TV GUI switches into program guide mode to show

3    TV programming carried by channels included in the currently

4    selected channel list.

5          So the user has customized a list to make it smaller,

6    a subset of all available channels, and then takes some action

7    in the guide that appears showing the programs appearing on the

8    channels included in the currently selected channel list.

9          Same -- same concept on the right.  Don't need to

10   belabor it to death.  When the user directs the remote pointing

11   device, again, the -- the channel changer is transformed into

12   an electronic program guide.

13         And, again, the program guide is formed out of.

14   Counsel talked about it's based on -- it's based on in the

15   sense that you have the one and then you can have the other.

16         This is the '781 patent I mentioned.  This transition

17   that I've been talking about is claimed expressly in the '781

18   patent.  Also claims priority to the same application.  And

19   this -- the application for this related patent is incorporated

20   by reference into the '043 and '333 specifications.

21         And this patent clearly claims a graphical channel

22   changer, same term, and a facilitated transition for displaying

23   in the second mode an electronic TV program guide including

24   said graphical options.  That is including what the channel

25   changer has presented.

1        And, again, the channel changer instantaneously and
2    directly transforms into that program guide.  And, again,
3    without the possibility that the two elements can be separate,
4    there can be no transformation from one to the next.  And this,
5    again, language from the '781 patent.  Again, these two
6    figures, both from that patent, showing Figure 6, just the
7    changer, Figure 7 with the guide.
8        Now, Samsung's focusing on the '333 patent.  And their
9    response to TiVo's arguments about the '904 application, they
10   don't deny the relevance of that application, nor could they.
11   They just say, well, it clearly teaches that they are -- the
12   channel changer and the guide are together.  But they focus on
13   Mode 2.  And they've quoted in their -- their brief language
14   that focuses on Mode 2.  They forget Mode 1 where the novelty
15   of the invention was to break the guide apart, and Mode 1 is
16   just the quoted channel changer.
17       I'm just going to go a little more quickly to speed
18   this up.  We've seen some of these slides before.
19       I want to talk also about the list point that counsel
20   raised.  He said that it's not a mere list.  It includes other
21   elements.  We don't dispute that.  Of course it's not a mere
22   list.  But looking at the claim language -- and just go back to
23   the claim language for a second -- the claim is a television
24   system comprising a CPU, a TV monitor for displaying this
25   channel changer for enabling the user to select the TV channel

1   among all the TV channels.   The fact that the channel changer

2   is not a mere list is embedded and included within the claim

3   language itself.

4          Our position is that if we're going to clearly define

5   what this is in the context of that claim language, then it's

6   accurately defined and described as a list of TV channels.

7   We're not saying it can't do anything with those channels.

8   Indeed, that's the point of the invention.

9          But if we're going to get some clarity to what this

10  is, our position that it is, in fact, a list of channels.   And

11  that's not pulled out of thin air.   That is based on the claims

12  and the specification and the prosecution history.

13         Here are the claims.   This is Claim 1.   It claims a

14  regular channel changer displaying all TV channels available.

15  A customized channel changer displaying a customized list of

16  the TV channels.   And because the customized list has the same

17  configuration as the regular channel changer, it would make no

18  sense for the regular channel changer to be anything other than

19  in list form.   Two configurations have to be the same.   The

20  patents says customized list -- customized channel changer is a

21  customized list.   It uses that language.   If the two

22  configurations are the same, they both just must be in list

23  form.

24         This is how they've consistently depicted it from the

25  beginning of the invention, August 1996.

```
 1              THE COURT:  What else?

 2              MR. GORDON:  I'm sorry, Your Honor?

 3              THE COURT:  I was going to ask you what else you had.

 4              MR. GORDON:  Samsung's citation, opening brief, again,

 5    in their papers, I think they've -- they've conceded this.  The

 6    position configuration operations of the channel changer

 7    remains unchanged regardless of whether all channels or only

 8    the customized list of TV channels is shown.

 9              Again, '904 application, the patentees themselves --

10    inventors themselves described as a list of channel logos.

11              Now, before I get the -- the selection point, Your

12    Honor, I want to address very briefly this notion that --

13              THE COURT:  Which notion?

14              MR. GORDON:  Thank you, Your Honor.  Appreciate your

15    patience for a minute.

16              The notion that Samsung's construction of a graphical

17    user interface element.  And they've said that's not unbounded,

18    and that it's -- they said it's defined by having channel

19    objects.  Well, I'm just going to get you to the right screen

20    so you can see the language I'm talking about, Your Honor, if

21    you'll bear with me for just a moment.

22              You can see on the right side -- it's faded, but

23    Samsung's construction is a graphical user interface element.

24    I'm not sure what that is, Your Honor.  Is that broad enough to

25    cover the entire electronic program guide?  Is it broad enough
```

to cover an Apple like Windows icon structure or a Windows

structure where you have different folders?  Just because they

have this idea of a channel object doesn't mean that a

graphical user interface element is somehow not unbounded.

We are trying to define this with some clarity as to

the purpose of claim construction.  We agree that this is in

the context of a graphical user interface.  That's what the

patent says.  It is a graphical user interface element.  It has

certain functionality.  But it would add ambiguity, not

clarity, to describe it as a graphical user interface element,

rather than what it is and how it's always been depicted, which

is a list of TV channels.

THE COURT:  But the parties no longer dispute that

channel object is, in effect, the name and channel number; is

that correct?

MR. GORDON:  So the parties have agreed on a

construction for channel object, and that is -- yes, Your

Honor, a selectable graphical user interface object that

depicts a channel name and channel number of a TV channel.

THE COURT:  Okay.

MR. GORDON:  And the last point, Your Honor, on

select.  The claims use the language "select."  I had the same

question you had.  Our position is that select in the context

of this patent means that you change the channel.  If Samsung

is saying that select does not mean tune or change the channel,

1    then they are trying to expand the scope of the claims beyond

2    the written claim language and import from the specification

3    certain language.

4           I think Mr. Green said that select means the same as

5    select for viewing.  Select is to change the channel.  That's

6    what we understand it to mean.

7           The addition of "and tuning," we just see as

8    redundant.  The claims use select.  And we add and select means

9    something different, they're trying to expand the -- expand the

10   scope of the language.

11          THE COURT:  Well, the reason -- the reason I asked the

12   question was I heard him say you would select and not just

13   select but select for viewing.  And I gathered there was a

14   distinction between select and select for viewing, which select

15   for viewing, I think he told me, meant the same thing as

16   tuning.  I'm still not clear whether there is a select that is

17   not a select for viewing that is different from tuning.  You

18   might address that.

19          MR. GORDON:  Certainly.

20          So in the -- in Samsung's reply brief, they stated for

21   the first time that selection alone refers to, quote,

22   identifying a particular TV channel.  Indeed, in certain

23   embodiments, channel objects are selected to build a customized

24   list without tuning to a channel.  So it appears that Samsung's

25   position is that select on its own in the '043 patent, for

1    example, does not mean select for viewing or to change the

2    channel.  We believe it does mean that, and that would be the

3    same as select for viewing in part because of the prosecution

4    history.

5           Mr. Green mentioned the -- the amendment over Miller.

6    The patent was initially rejected over Miller because the

7    Office Action said that, well, Miller does not disclose a

8    graphical channel changer and does not function to change the

9    channel, in response to which the patentee added the -- added

10   in the '333 patent, whereby said graphical changer -- channel

11   changer allows selection of desired TV program for viewing.

12          So to get around the concept that, you know, it

13   doesn't function to change the channel, they add the language,

14   "selection of a desired TV program for viewing."  That may be

15   fine in the '043 patent -- that's selection of a TV program for

16   viewing means change the channel, but there's no reason to

17   import a separate redundant tuning element which would expand

18   the scope of the '043 -- '043 claim.

19          Briefly with respect to channel objects, Your Honor,

20   and I will try to go quickly.  Mr. Green commented on how the

21   claim language must have channel objects.  The '043 patent

22   doesn't mention channel objects in Claim 1.  It does not

23   reference them.  In fact, in Claim 2, it says -- it claims:

24   The system of Claim 1 wherein said regular and customized

25   channel changers comprise channel objects for enabling the user

1   to switch the TV channels by directing remote pointing --

2   pointing device at said channel object.  Basic construct of

3   claim differentiation, Claim 2 includes the channel objects.

4   Claim 1 must be broader and cannot include the channel objects.

5        Now, Mr. Green might come up here and say, well, these

6   channel objects are for enabling the user to switch the TV

7   channels by directing the remote pointing devices at channel

8   objects.  I've looked at the '043 patent, I can't think of how

9   many times now, and I don't see any other discussion of any

10  other way to change the channel in this patent other than by

11  pointing a remote device and selecting something and changing

12  the channels.

13       THE COURT:  All right.  What else?

14       MR. GORDON:  That is it, Your Honor.

15       THE COURT:  All right.  Let me hear in response from

16  Samsung.

17       MR. GREEN:  Thank you, Your Honor.

18       Very quickly, those -- those things that Mr. Gordon

19  said I'm going to say, I'm not going to say them.  But I am

20  going to make two points in less than two minutes, and you can

21  hold me to it.

22       The first one is we saw on Slide 30 -- if I could have

23  it, Slide 30 of TiVo's presentation -- you're going to see a

24  lot of discussion of a patent from this family, not the two

25  patents in this lawsuit, but a patent from the same family

```
 1  called the '781 patent that claims this facilitated transition.

 2  And if we were construing this claim, then maybe we could talk

 3  about a lot of the evidence that Mr. Gordon showed you, but

 4  we're not.  The claims of these patents are not directed to

 5  facilitated transitions from a channel changer to a program

 6  guide.  The claims here pick up with the program guide or the

 7  presence of the channel changers.  There's no -- there are

 8  other embodiments in the patents that describe that process of

 9  growing a program guide out of a channel changer.  That's not

10  what's claimed here.

11        If TiVo wants to attack our claims on some other

12  grounds because they don't -- they don't describe the

13  facilitated transition or whatever, they may do that.  But for

14  claim construction, we should construe the claims according to

15  the language as it's written.  This claim, the '781 patent

16  claim.  Not what we have.

17        The second point I wanted to make, Your Honor, was to

18  hopefully directly and finally address your question about the

19  difference in selecting and tuning.

20        If I may have Slide 25 of Samsung's presentation.

21  That's it.

22        Tuning and selection.  Tuning may happen in response

23  to selection.  But selection can happen without tuning.  Here's

24  an example.  I know Your Honor and your staff are going to read

25  the patent carefully.  You will see a description in both
```

1  specifications of building a channel changer where the user

2  gets to pick which channels.  It's called like a favorites

3  list.  I may have six or seven channels I want to watch, and

4  there's a description of this in very clear terms where I pick

5  the ABC channel, the Disney channel, the ESPN channels, and I

6  move them into a -- kind of a custom programming guide.  I can

7  select those channel objects, and I can select those channels

8  for inclusion in my -- my custom well.  But I haven't tuned any

9  of them yet.  I'm just building a custom channel changer.

10         It's only when I go to viewing and wanting to see the

11 actual program, that's selection and tuning.  And that's --

12 that's all there is, and there ain't no more, Your Honor.

13 Thank you.

14         THE COURT:  So effectively, you're telling me there is

15 selection for gathering information?

16         MR. GREEN:  That's correct.

17         THE COURT:  And then there's selection for viewing?

18         MR. GREEN:  That's correct.  Selection and identifying

19 something for some purpose.  For the specific purpose of

20 viewing, you have to tune.  Thank you.

21         THE COURT:  All right.

22         MR. GREEN:  Thank you.

23         THE COURT:  All right.  Let's -- let's move on to

24 argument with regard to capable of displaying a user interface.

25 This is a Samsung term in dispute from their asserted patent,

```
 1   the '592.  Let me hear from Samsung on this term.
 2           MR. GREEN:  Thank you, again, Your Honor.
 3           If I may have Slide No. 36.
 4           Okay.  Your Honor, we say no construction necessary.
 5   It was very easy to write that part of the brief, no
 6   construction necessary.
 7           TiVo said:  Possessing its own display capability
 8   comprising a screen for display.  And there's a new element
 9   here that got added in reply called content for a user.  So do
10   we have to have an embedded display screen, and do we need this
11   content to a user limitation?  The answer to both questions
12   conveniently is -- is no.
13           So let's go right to it.  Slide 38.
14           We see the plain language says:  Capable of displaying
15   a user interface.  Not a user interface, not a screen, not a
16   television monitor.  It says, capable of displaying, plain
17   language, end of discussion, we think.
18           THE COURT:  So what you're telling me is if a signal
19   is sent, whether anybody ever sees it or not, it's capable of
20   displaying?
21           MR. GREEN:  Like a forest falling in the tree, Your
22   Honor -- or a tree falling in the forest.  I just coined a
23   new -- yes.  I'll stop there.
24           THE COURT:  Okay.
25           MR. GREEN:  You're exactly right.
```

1          THE COURT:  I understand your position.  I'm not

2    saying I agree with it, but I understand it.

3          MR. GREEN:  Thank you.

4          Looking at the specification, we see examples of home

5    devices connected to a home network.  And remember, this

6    capable of displaying function goes with home devices.  We see

7    a direct broadcast satellite system 104.  We see a digital

8    video device 108 and a digital video cassette recorder 110.

9    Those three things have one thing in common, and that one thing

10   is none of them have a monitor.  They don't have an embedded

11   display.

12         We see them here in Figure 1, as shown on Slide No. --

13   Slide No. -- oh, my goodness, I can't read my slide numbers,

14   Slide No. 39.

15         No displays.  We see more -- we really think -- we

16   think unequivocal disclosure from the specification, the

17   capabilities -- operative word "capabilities" of a digital

18   video cassette recorder generally include accepting video and

19   displaying video.  I've not heard or not seen any contention

20   from TiVo that a DVC -- a digital video cassette recorder must

21   have a -- a monitor or does have a monitor.

22         What we do see when we read the specification is that

23   when the patentees meant to describe a device that had its own

24   screen, they used different language.  So topmost excerpt on

25   this slide describes a DTV, a digital television, having a

1   viewable display.  We see another reference to the digital

2   television as comprising a screen.  And then the last reference

3   at the bottom of the slide, a video display of a client device,

4   such as a TV or a personal computer.

5          Again, a distinction, Your Honor, in the language used

6   when we mean to say has a display versus is capable of

7   displaying.

8          I'm going to skip ahead to the last point, Your Honor,

9   in the interest of time and address anything else that TiVo

10  wants to say on rebuttal.

11         The last part of the construction that TiVo put out

12  there, and, again, I think they did on it reply, was this --

13  adding this requirement of content to a user, and they did that

14  to get rid of a requirement for an HTML concept in the claim

15  construction.

16         So that's incorrect, and here's why.  The

17  specification describes a user interface that allows command

18  and control of home devices.  I don't know what content to a

19  user means.  Content to a user could be a picture, it could be

20  some alphanumeric string.  There's nothing that suggests

21  content to a user is going to allow command and control of home

22  devices.

23         And if we read the specification, we see the user

24  interface is to enable the user to control and command any

25  device.  Each home device provides an interface for commanding

1    and controlling the home network.  We never see this phrase

2    "content to a user" anywhere.  It's not in the plain language

3    of the claims.  It's logically inconsistent with the notion of

4    the controlling and command and control information.  And,

5    therefore, it's incorrect.

6            I'll reserve the rest of the time for rebuttal, as

7    needed.

8            Thank you.

9            THE COURT:  Let me hear from TiVo in response, please.

10           MR. GORDON:  Thank you, Your Honor.  I will try to be

11   brief.

12           With respect to capable of displaying a user -- a user

13   interface, I think you'll see here several of the same images

14   and some of the same language on our slides as you just saw on

15   Samsung's slides.

16           What I want to do first and briefly is just put this

17   into context.  Claim 1 of the '592 patent in which this appears

18   describes the purpose of displaying of a user -- a home device

19   that is capable of displaying a user -- a user interface, and

20   that's to accept user input from a user by a presently

21   connected home device that is capable of displaying a user

22   interface.

23           And the patent distinguishes in this -- in this way

24   from home devices that are not so capable that have been

25   connected to the network and devices that are so capable that

1    have been connected to the network.  And through this user

2    input, the patent then goes on to claim controlling home

3    devices based on that user input.

4         So on this brief graphic, you can have a network with

5    various home devices connected to it, but the user input goes

6    through one of those devices that is capable of displaying a

7    user interface.  And it is so capable because that is how the

8    user can interact with it.  It must have a screen to do so.

9         The specification consistently describes what it calls

10   client-facing devices having a display.  Mr. Green put up

11   something very similar or perhaps identical to this Figure 1.

12   You can see on the right, the DTV, Item 102 with the arrows,

13   human interface, pointing to it.  That's the -- the device that

14   is capable of displaying user interface.  The DVD and the DVCR

15   on the left are not client facing.  They're not -- they don't

16   have a human interface.

17        So in various language from the specification, the

18   user interacts with home devices, you know, on its -- on those

19   devices' viewable -- viewable display.  On the bottom, the DTV,

20   because it has a screen, can provide the human interface for

21   the home network as it comprises a screen for displaying HTML

22   pages.  We no longer say that's a limitation of the claim.

23        But what is correct is that only some devices are

24   capable of displaying an interface.  And the patent

25   consistently discusses those in the sense that they have a

```
 1   viewable display or a screen.

 2          THE COURT:  In other words, what you're telling me is

 3   Samsung wants me to read this phrase in isolation, but when I

 4   read it as modifying the term "device," then capable -- a

 5   device capable of displaying needs a screen, but capable of

 6   displaying by itself may mean merely capable but not actually

 7   displaying.  Is that the distinction?

 8          MR. GORDON:  So I don't think that's quite the

 9   distinction, Your Honor.

10          THE COURT:  All right.

11          MR. GORDON:  I think the patent discusses numerous

12   devices that are capable of projecting information, sending

13   information to be displayed, such as a DVD player or a DCVR on

14   this -- this slide here.  Those -- that -- that content, and

15   we'll talk about content in a second, but that -- those

16   devices are accessed and controlled in the context of this

17   patent through the device that has a screen, through the

18   device that is, quote, capable of displaying user interface,

19   because that is how the user interacts with all of the devices

20   as the patent is constructed.  And this is not just the

21   specification.

22          Again, this patent claims priority to provisional

23   application, and in this provisional application, again, they

24   have this same setup, client and server.  And the client

25   devices -- it says here it here in the middle of the screen --
```

1   show content to users.  Internet DTV is a good example of a

2   client device.  The user capable of displaying user interface

3   because they're client based, and they have a screen.

4          The inventor said, what is display capable?  It's a

5   client display device.  What is a server device?  That's not a

6   display device.  No listing of display capable.  It might have

7   a GUI.  It might have some information that is able to -- to be

8   displayed, but it doesn't have a display itself.

9          Again, the same thing.  At the bottom, the HDVCR is a

10  server device, capable of transmitting content, transmitting an

11  A/V stream.  This is what Mr. Green pointed to in the

12  specification where this is the same thing, a DVCR that's

13  capable of displaying video.

14         What they meant in the provisional application in

15  which this claims priority is that that information is

16  displayed to the user through a -- a device with a screen.

17         And I just briefly want to mention one thing in the

18  prosecution history, Your Honor, because I think it's

19  important.  In the prosecution history, the patent was

20  initially rejected over this Suzuki reference in which various

21  robots could send data and images to a user who could see what

22  was happening with those robots, through a computer, through a

23  screen.  They could be -- the robots could be monitored and

24  operated remotely by a web-based display, but the robots were

25  sending information that could be seen on that display.

1    There's an image of what the robot could send, pictures, data,

2    et cetera.

3            Samsung, during construct -- during prosecution said,

4    indeed, Suzuki does not disclose that a robot displays a

5    user -- user interface for receiving user input.  And that's

6    because it was not how the user was interacting with the robot.

7    It was capable of sending that information to be displayed, but

8    it itself did not have that user interface.

9            And for that reason, the patentees argued that Suzuki

10   did not disclose a home device that's capable of displaying a

11   user interface.

12           Now, other things were at issue in this -- in this

13   rejection.  There were issues of control.  There were issues of

14   what type of home device this was, but this was absolutely at

15   issue, that Samsung said, indeed, Suzuki does not disclose that

16   a robot displays a user interface first for receiving inputs.

17   That is one way in which they distinguished the robots in

18   Suzuki from the claims of their patent.

19           And that's all I have, Your Honor.

20           THE COURT:  All right.  Thank you.  Let me have a

21   response from Samsung.

22           MR. GREEN:  Thank you, Your Honor.

23           Very quickly.  There's a lot of talk about client and

24   server in the briefing, and a lot of client and server

25   discussion in the presentation you just saw, but one place

```
1    you'll never see the words "client" and "server" are -- is in

2    the claims to be construed.  It's not there.

3           So I believe TiVo has improperly borrowed something

4    from a provisional application, a particularized embodiment,

5    contorted the words a little bit, and then tried to rewrite

6    the claims into what is described in the provisional.  And we

7    all know that's not how you conduct claim construction.  It's

8    not there.  Our papers are sufficient on this.  I'm going to

9    have my fingers crossed when I say that, so I'm going to leave

10   it there.

11          On the Suzuki point, the robots, they look pretty

12   cool.  I think my 10 and 8-year-old would really like remote

13   controlled robots that take pictures and move around the room.

14          THE COURT:  Is that relevant?

15          MR. GREEN:  Well, what I'm going to say is they take

16   pictures, and that's what they do.  They can't control each

17   other.  It may be an interesting thing to talk about, but

18   that's it.  They don't -- they're not home devices.  They are

19   not -- they're not -- they were distinguished on multiple

20   grounds, not solely on the basis of lacking the capability of a

21   display.

22          TiVo has stitched together unrelated parts of that

23   prosecution discussion, Your Honor and your staff will not see

24   clear disclaimer saying those robots are not home devices

25   simply because they don't have the capability of displaying.
```

1   And that's my point, Your Honor.

2          THE COURT:  All right.  All right, counsel.  Thank

3   you.

4          MR. GREEN:   Thank you.

5          THE COURT:  That will complete argument on the five

6   identified terms for argument this afternoon.  The remaining

7   terms in dispute, the Court will consider based on the

8   extensive briefing that I have before me.

9          I'll endeavor, counsel, to get you written guidance by

10  way of a claim construction opinion as time will permit.

11         You're aware, I know, that it's the Court's practice

12  and custom to require that you mediate within 30 days of the

13  issuance of a claim construction order.

14         I expect it will take me, given the scope and the

15  breadth of what's here, not only what's been argued today but

16  what's not been argued, I expect it take several weeks to get

17  you a claim construction order, but I will do my best to get it

18  out as promptly as permitted.

19         Are there questions from either side before we recess

20  for the day?

21         Anything further from Plaintiff.

22         MR. CHU:  No, Your Honor.

23         THE COURT:  Anything further from Defendants?

24         MR. CORDELL:  No, Your Honor.  Thank you.

25         THE COURT:  That completes today's claim construction

```
 1   hearing, counsel.  Thank you for your argument and attendance.

 2   You're excused.

 3           COURT SECURITY OFFICER:  All rise.

 4           (Hearing concluded.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                          11/1/16
     SHELLY HOLMES, CSR-TCRR                     Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25